1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11   THOMAS ROSS,                          Case No.: 21CV-2130-JO-VET

12                          Plaintiff,

13   v.                                    **ORDER GRANTING DEFENDANTS'
                                           MOTION FOR SUMMARY
14   COUNTY OF SAN DIEGO; SAN              JUDGMENT**
     DIEGO COUNTY SHERIFF'S
15   DEPARTMENT; et. al.,

16                          Defendants.

17

18

19

20        Plaintiff Thomas Ross[1] filed a civil rights action pursuant to 42 U.S.C. § 1983 alleging

21   that San Diego Sheriff's Deputies used excessive force when they restrained and arrested

22   him on December 17, 2020.  Dkt. 25, Second Amended Complaint ("SAC").  Defendants

23   moved for summary judgment on the grounds that qualified immunity shields these

24   officers' actions.  Dkt. 95-2 ("Def. Mot. Summ. J.").  For the reasons stated below, the

25   Court GRANTS Defendants' motion for summary judgment on all claims.

26

27

28        [1]  Mr. Thomas Ross is now deceased, for reasons unrelated to the December 2020 incident
     described here.  Robert Ross, his brother, is prosecuting this case on his behalf.

1

21CV-2130-JO-VET

# I. BACKGROUND

On December 17, 2020, the San Diego Sherriff's Department received frightened 911 calls from Plaintiff's roommate, Ms. Connie Estrada, and from Plaintiff himself. At around 2:00 a.m., Plaintiff arrived at their shared residence and woke up Ms. Estrada by shouting and screaming incoherently at her and repeatedly yelling her name. Dkt. 96-1 (Dow Police Report), Dow bodyworn camera transcript ("Dow BWC Tr.") at 2-3; Dow Dep. Tr. at 35-36. Alarmed by his behavior, Ms. Estrada and Ms. Lopez, another roommate, locked themselves in Ms. Estrada's room. Lopez Dep. Tr. at 33-34; *see also* Dkt. 96-1 at 7. Plaintiff continued to shout Ms. Estrada's name and repeatedly called her cell phone. *Id*.; Estrada Dep. Tr. at 33-37. Fearful for her safety, Ms. Estrada called 911 twice and then left the apartment with Ms. Lopez to wait for the police. Estrada Dep. Tr. at 3. During this time, Plaintiff also made calls to the Sheriff's Department telling them that he felt "unsafe" in his home for unspecified reasons, repeatedly mentioning Ms. Estrada's name without elaboration. SAC at 5; *see also* Dow Dep. Tr. at 65-66. Because of Ms. Estrada's and Plaintiff's calls, the Sherriff's Dispatch requested a welfare check on Mr. Ross. Dow Dep. Tr. at 65-66.

When Deputies Saunders and Dow arrived to conduct the welfare check, they attempted to assist Mr. Ross and to calm him down. Ms. Estrada told the deputies that Mr. Ross had not been home in three days and, upon returning home in the middle of the night, had begun shouting at her. Saunders bodyworn camera transcript ("Saunders BWC Tr.") at 2-3; *see also* Dow bodyworn camera footage ("Dow BWC") at 11:09:00-11:15:32. The deputies entered the residence and approached Mr. Ross's room to check on him. *Id.* Bodyworn camera footage captures their approximately six-minute interaction in the hallway. After initially slamming his bedroom door shut, Plaintiff reopened it when Deputy Dow introduced herself. Dow BWC at 11:09:00-11:09:38. Although parts of the conversation are inaudible, Mr. Ross told the deputies that that he felt "trapped," "threatened," and "disrespected"; that he "[didn't] know these people"; and asked the

deputies for help.[2]  Dow BWC Tr. at 2-5.  In response to this request, Dow affirmed that they were there to help and offered to escort Mr. Ross outside if he felt unsafe.  *Id*. at 2-10.

However, instead of accepting the deputies' offer, Mr. Ross began rapidly and incoherently oscillating between requesting an escort to leave and shouting that he couldn't leave and saying that he "just want[ed] to go home." *Id*. at 5-9.  He then began complaining that he felt "trapped" and unsafe because the deputies were standing in the hallway.  *Id*.  Although Dow offered several times to move out of the way so that he wouldn't feel trapped, Mr. Ross ignored these requests and, screaming the entire time, ran past both deputies and out of the apartment.  They allowed Mr. Ross to pass and followed him as he ran into his vehicle and slammed the door closed.  Dow BWC at 11:15:32-11:19:20.  Based on these interactions, the deputies suspected that Mr. Ross was experiencing a mental health episode or under the influence of a controlled substance, and likely the latter given his paranoia, incoherence, and rigid and sudden body movements.  Dow Dep. Tr. at 69-70; Saunders Dep. Tr. at 142.

For the next ten minutes, the deputies continued their attempts to reason with Plaintiff and offer him help, but his erratic behavior only escalated.   Dow BWC at 11:19:20-11:31:38.  Upon entering his car,  Mr. Ross started his engine and stayed inside his vehicle while screaming; calling 911 again; banging his hands on the steering wheel and car window; slamming the car door open and shut; and repeatedly accusing the deputies of trapping and tricking him.  *Id.*  During this time, Deputy Dow continued her attempts to calm him, including by asking about his mental health diagnoses, where he might feel safe, and how she could help.  Dow BWC Tr. at 13-22; *see also* Dow BWC at 11:19:20-11:31:38.  But Mr. Ross continued to scream and slam his door open and shut, and eventually ran out of the vehicle and past the deputies.  Saunders bodyworn camera footage ("Saunders BWC") at 11:30:00-11:35:17.

---

[2]  Mr. Ross did not specify who he felt trapped and threatened by, but at one point he seems to refer to Ms. Estrada as the one who "didn't respect [him]."  *Id*. at 3.

21CV-2130-JO-VET

The deputies first ordered Mr. Ross to surrender after he began banging on Ms. Estrada's vehicle and ran directly at Deputy Saunders. The deputies then pulled out their Tasers and ordered Mr. Ross to get on his stomach. *Id.* at 11:35:17-11:35:40. By this point, Deputies Dow and Saunders had been attempting to reason with Mr. Ross for well over twenty-five minutes. *See id.* at 11:09:00-11:35:40. Although Mr. Ross said "I surrender" numerous times, he did not comply with the deputies' thirty-five orders to get on the ground. Dow BWC Tr. at 23:14-27:15. Deputy Saunders then told Mr. Ross to turn around if he was, in fact, surrendering, and Mr. Ross responded "no." *Id.* at 26:17-28:10. Deputy Saunders repeated his order to turn around seven more times, and Mr. Ross again refused, stating, "don't touch me," "I won't do that," and "if I turn around you guys outnumber me." Saunders BWC Tr. at 26:5-7; Saunders BWC at 11:35:17-11:37:01.

After Mr. Ross refused the deputies' repeated orders to turn around, Deputy Saunders physically engaged with Plaintiff for the first time. He approached Mr. Ross, grabbed his shoulder, and attempted to turn him physically towards the car to place him in handcuffs. Saunders BWC at 11:36:45-11:37:02. The two fell to the ground as Mr. Ross tried to pull away and Deputy Saunders attempted to restrain him. Dow BWC at 11:33:20-11:33:55; Dow Dep. Tr. at 79:11-13. Deputy Saunders delivered two strikes to Mr. Ross's head in an attempt to gain compliance and positioned himself on top of Mr. Ross's upper body, while Deputy Dow mounted his legs to assist in physically restraining him. *Id.* The deputies shouted at Mr. Ross to stop resisting and to stop flexing his hands; Deputy Saunders also shouted at Mr. Ross to stop attempting to bite him.[3] Saunders BWC Tr. at 27. Deputy Saunders also employed a knee strike to Mr. Ross's back during an attempt to roll him into a prone position. Saunders Rep. at 3.

---

[3] Plaintiff argues that there is no video evidence of an attempted bite on the part of Mr. Ross. The Court agrees that the video evidence is inconclusive as to whether Mr. Ross attempted to bite any of the deputies, and for purposes of summary judgment, assumes no actual bite or attempted bite took place. However, it is not in dispute that Deputy Saunders shouted multiple times at Mr. Ross to "stop biting," which is relevant to the information the other deputies had at the time they employed force.

21CV-2130-JO-VET

While struggling to hold Mr. Ross in this position for nearly three minutes, the deputies radioed for additional assistance. Saunders BWC at 11:37:02-11:38:39. Deputy Ramos arrived about two minutes after the deputies radioed and asked them how he could assist. Deputy Saunders requested a "full mount," and Deputy Ramos positioned himself next to Deputy Saunders on top of Mr. Ross's upper body, who was continuing to actively resist. Ramos bodyworn camera footage ("Ramos BWC") at 11:38:30-11:39:15. The three deputies attempted to roll Mr. Ross into a seated or prone position to handcuff him; Deputy Dow shouted at Mr. Ross to "stop kicking," and Deputy Saunders shouted at Mr. Ross to "let go of [his] hand." *Id*. at 11:38:30-11:41:00. During this entire time, the camera footage shows Mr. Ross thrashing, kicking, and frustrating the attempts of the deputies to place his arms behind his back. *Id*.

After his initial attempts to help subdue Plaintiff failed, Deputy Ramos resorted to the use of his Taser and fist strikes to gain compliance and to prevent Plaintiff from grabbing one of the deputies' weapons. Right after hearing the other two deputies shout at Mr. Ross to stop kicking, biting, and to let go, Deputy Ramos deployed his Taser while Deputy Saunders shouted at Mr. Ross to place his arms behind his back. Saunders BWC Tr. at 31:23-33:13. A few seconds later, when Mr. Ross failed to comply, Deputy Ramos tased him a second time; body camera footage shows Mr. Ross was not yet incapacitated and continued to fiercely resist by kicking, thrashing, and attempting to free his hands even while being tased. Ramos BWC at 11:38:30-11:41:00. Because Deputy Ramos began losing control of Mr. Ross's right arm, he also deployed two fist strikes to Mr. Ross's head to prevent him from grabbing one of the deputies' weapons. Ramos Rep. at 2. During this struggle, Mr. Ross said, "you're killing me" and "I can't breathe" several times. Dow BWC Tr. at 32:16-25. After another several minutes of significant physical exertion, the three deputies were finally able to place both of Mr. Ross's arms behind his back and handcuff him. Ramos BWC at 11:41:00-11:43:30. In total, it took the three deputies more than five minutes, two Taser deployments, and multiple strikes to Mr. Ross's head and

back to successfully handcuff him. Ramos BWC 11:38:00-11:43:30. Deputy Ramos then told Mr. Ross that he was being placed under arrest.

After three more deputies, including Deputy McCarthy, arrived on the scene, Deputy Dow requested that Mr. Ross be placed in a WRAP device to fully immobilize him because he was continuing to kick and trying to break free even after being handcuffed. Dow Dep. Tr. at 79:22-80:10. Deputies Ramos, Dow, Saunders, and McCarthy were able to apply the WRAP after several more minutes of significant effort. Dow BWC at 11:43:30-46:38. Even after Mr. Ross was placed in the WRAP device and fully immobilized, he continued to thrash about and actively resist. Saunders BWC at 11:46:30-11:48:40. Finally, the deputies placed a spit sock over Mr. Ross's head because they were concerned that he would attempt to bite them.[4] *Id.*; *see also* McCarthy Force Rep. Mr. Ross was then taken to the hospital for medical attention and was later charged with misdemeanor public intoxication, misdemeanor resisting arrest, and the felony of resisting an executive officer.

Plaintiff filed a complaint against Deputies Dow, McCarthy, Saunders, and Ramos on December 28, 2021, alleging that the Deputies used excessive force and violated Mr. Ross's Fourth Amendment rights under 42 U.S.C. §1983. *See generally* Second Am. Compl. Plaintiff also sued the County of San Diego and the San Diego Sheriff's Department ("County Defendants"), alleging that both had failed to properly train and supervise the Deputies in violation of 42 U.S.C. §1983, and separately maintained an unconstitutional policy of using excessive force in arrests in violation of *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978). *Id.* Finally, Plaintiff filed state law claims of negligence, battery, and violations of the Bane Act (Cal. Civ. Code § 52.1) against all defendants ("Defendants"). Defendants moved for summary judgment on all the respective claims against them.[5] Dkt. 95-1 ("Def. Mot. Summ. J.").

---

[4] Plaintiff does not challenge the deputies' use of the spit sock as excessive force.

[5] Defendants also moved in their motions *in limine* to exclude certain expert opinions proffered by Roger Clark on the grounds that they constitute impermissible legal conclusions but do not raise

21CV-2130-JO-VET

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact. Fed. R. Civ. P. 56(a). A fact is material if it could affect the outcome of the case under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.*

A party seeking summary judgment always bears the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party has failed to establish an essential element of the nonmoving party's case for which they bear the burden of proof at trial. *Id.* at 322–23. The moving party may also satisfy its initial burden by demonstrating that the opposing party lacks sufficient evidence from which a jury could find an essential element of the opposing party's claim. *Id.* at 325; *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F. 3d. 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the nonmoving party to provide evidence that there is a genuine dispute for trial. *See Celotex*, 477 U.S. at 324. The nonmoving party cannot merely rest on their pleadings, but must direct the court to specific, triable facts by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); *see Anderson*, 477 U.S. at 250. The court must view all reasonable inferences that can be drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587

---

these as evidentiary objections for the purposes of the summary judgment motion. Dkts. 96, 101. To the extent that they sought to do so through their motions *in limine*, the Court overrules these objections as moot because the Court did not rely on the objected-to portions in reaching its decision, and they would not create a genuine dispute of fact regarding any issue material to summary judgment.

21CV-2130-JO-VET

(1986).   However, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 378-79 (2007) (hereinafter *Scott*) (lower court should have discredited plaintiff's factual allegations at summary judgment where video evidence flatly contradicted plaintiff's version of events).   Moreover, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa de Viacao Aerea Rio Grandense v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

## III. DISCUSSION

In his Fourth Amendment claims, Plaintiff alleges that San Diego County Sherriff's Deputies used excessive force against him when (1) Deputy Saunders first took him down in the parking lot; (2) Deputies Saunders and Dow attempted to subdue and restrain him on the ground before Deputy Ramos arrived, including by using two fist strikes and a pain compliance technique; (3) Deputy Ramos used two Taser deployments and two fist strikes against him; and (4) Deputies Saunders, Dow, and McCarthy placed him in handcuffs and a full-body WRAP restraint.[6]  For each of these actions, to determine whether the officers are entitled to qualified immunity, the Court will first examine whether the force used was objectively reasonable given the totality of the circumstances and, if so, whether a reasonable officer would have known their conduct was illegal based on clearly established law, to determine whether the officers are entitled to qualified immunity.[7]  If it concludes

---

[6] After reviewing Plaintiff's Second Amended Complaint and Opposition Brief, the Court concludes that Plaintiff alleges four distinct instances of excessive force. The Court addresses each of these instances or phases separately for the purpose of its analysis. *See* SAC ¶¶ 23, 64, 73; Pl. Opp. Br. at 16-20.

[7] Plaintiff relies on the following opinions of his police practices expert, Roger Clark, to raise a triable issue of fact regarding the reasonableness of the deputies' actions: (1) "the use of force and restraint inflicted on Mr. Ross by the Defendants was excessive and unreasonable, including but not limited to Deputy Ramos' use of his of his Taser [sic], the severe knee strike by Deputy Saunders, and the multiple closed-fist strikes delivered to Mr. Ross' [sic] by them both," and (2) "even one use of Deputy Ramos's Taser could prove highly dangerous and, in light of alternatives, was not objectively reasonable."  Opp.

21CV-2130-JO-VET

that the Deputies in question acted reasonably, the Court will then address the viability of Plaintiff's municipal liability or *Monell* claims that are premised on the same actions or uses of force. The Court will next address whether the Fourteenth Amendment is the correct vehicle for what Plaintiff styles as an arbitrary investigation and arrest claim, and, finally, whether the Court should exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## A. The Law on Qualified Immunity in the Context of Excessive Force Claims

Because Defendants ask the Court to decide whether Deputies Dow, Saunders, Ramos, and McCarthy are entitled to qualified immunity from Plaintiff's § 1983 excessive force claim, the Court will begin by setting forth the law in this area.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). To defeat the defense of qualified immunity, the plaintiff must satisfy a two-pronged burden: (1) the plaintiff must allege or show sufficient facts to "make out a violation of a constitutional right"; and (2) the plaintiff must demonstrate that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Id*.

In Fourth Amendment excessive force cases, courts examine whether police officers' actions are "objectively reasonable under the totality of the circumstances" to determine whether there was a constitutional violation. *Graham v. Connor*, 490 U.S. 386, 396-97 (1989). Whether a use of force was reasonable will depend on the facts of the particular case; in each case, courts must balance the "type and amount of force inflicted"

---

Br. at 20, 22. These constitute impermissible legal conclusions about the ultimate issue in this case: whether the uses of force in question were reasonable. *Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004) ("[A]n expert witness cannot give an opinion as to [their] legal conclusion, i.e., an opinion on an ultimate issue of law."). The Court therefore does not consider these opinions in deciding this issue. Plaintiff cites to no other portions of the expert testimony or opinion in its opposition, so the Court declines to address the admissibility of the remainder of his opinion.

against the countervailing governmental interests at stake. *Id.* at 396; *see also Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (internal citations omitted).  Courts consider three non-exhaustive factors in determining whether the force at issue was objectively reasonable: (1) whether the suspect posed an immediate threat to anyone; (2) whether the suspect resisted or attempted to evade arrest; and (3) the severity of the crime at issue (the "*Graham* factors").  *Graham*, 490 U.S. at 396.  The most important of these factors is whether the suspect posed an immediate threat.  *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc) (*Mattos II*).  Courts may also consider any other relevant factors in evaluating the reasonableness of a particular use of force, including (1) "the availability of less intrusive alternatives to the force employed," *Williamson v. City of National City*, 23 F.4th 1146, 1153 (9th Cir. 2022); (2) whether officers gave a " a warning or an order to halt" before using force,  *Bryan v. MacPherson*, 630 F.3d 805, 831 (9th Cir. 2010); and (3) whether it should have been "apparent to officers that the individual involved [was] emotionally disturbed," *Deorle v. Rutherford*, 272 F.3d 1272, 1283 (9th Cir. 2001).

If the Court finds that the officers committed a constitutional violation, it must then determine whether they did so in  violation of clearly established law.  *Sampson v. Cnty of Los Angeles*, 964 F.3d 1012, 1018 (9th Cir. 2020) (citations omitted).   An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it."  *Kisela v. Hughes*, 548 U.S. 100, 105 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014)).  Except for an "obvious" case in which the *Graham*'s factors alone are sufficient to "'clearly establish' the answer," the plaintiff "must identify a case that put [the officer] on notice that his specific conduct was unlawful" to defeat qualified immunity.  *Rivas-Villegas v. Cotresluna*, 595 U.S. 1, 6 (2021).  While it is not necessary for a plaintiff to find "a case directly on point," the case must be sufficiently similar that it can be said to "squarely govern" the factual circumstances at

hand.  In other words, "existing precedent must have placed the statutory or constitutional question beyond debate."  *Kisela*, 584 U.S. at 104.

**B.    Deputy Saunders' Takedown Was Not Unconstitutionally Excessive**

The Court first examines whether Deputy Saunders acted reasonably when he first initiated physical contact with Plaintiff by attempting to turn him around and, upon meeting resistance, brought him to the ground.  The Court begins this analysis by determining the "quantum of force" that Deputy Saunders deployed, and then balances this against the government's interest in using that force.

Based on the video footage of this interaction, the Court concludes that Deputy Saunders' takedown of Mr. Ross constituted a low to intermediate level of force.  The undisputed facts show that Deputy Saunders approached Mr. Ross, attempted to turn him around, and when Mr. Ross pulled away, the two fell to the ground.  This is objectively less force than impact blows, such as punching or tackling, which are widely considered to be intermediate levels of force.[8]  *See, e.g.*, *Garlick v. County of Kern*, 167 F. Supp. 3d 1117, 1147 (E.D. Cal. 2016) (collecting Ninth Circuit cases and finding that baton blows and impact blows by punching are generally considered intermediate and significant uses of force, respectively); *Bryan*, 630 F.3d at 811 (holding that Tasers and stun guns fall into the category of intermediate or medium force).

When Deputy Saunders used this low to intermediate level of force, he faced an immediate potential danger to himself given Mr. Ross's escalating bizarre and agitated behavior, and his failure to get down on the ground despite repeated orders.  *See Chew v.*

---

[8]  The San Diego Sherriff Department's Force Guidelines designate "Less Lethal" as the lowest level of physical force.  They define Less Lethal as "force not likely to inflict serious injury. Less severe than intermediate or lethal force.  Less lethal force includes hands-on-control …. And the use of batons, WRAP, Cord Cuff restraints, etc. when used for restraint."  The SDSD Force Guidelines define "Intermediate" force, the next level, as follows: "Intermediate force refers to forms of force capable of inflicting significant pain and causing serious injury…  Intermediate force includes hard intermediate weapons when used to deliver strikes… electronic immobilization devices also fall within the intermediate weapons category."  Dkt. 103 at 6.

*Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994) ("the most important of the *Graham* factors is the danger the suspect poses to the officer or others."). Leading up to this moment, Deputies Saunders and Dow had ample reason, based on their own observations and firsthand accounts from Plaintiff's roommates, to suspect that Plaintiff was suffering a mental break, under the influence, or both. *See, e.g.*, Dow Dep. Tr. at 69-70, Saunders Arrest Rep. at 5; *see also* Ramos Dep. Tr. at 142-143. Before the deputies arrived, Plaintiff had been incoherently screaming at his roommates, leading them to call 911 and flee the apartment for their own safety. Estrada Dep. Tr. at 33-37; Lopez Dep. Tr. at 33-34. Despite the deputies' sustained efforts to calm him and talk to him, Mr. Ross became increasingly erratic and unpredictable as the encounter went on. His actions took a physically volatile turn when, after locking himself in his car, he started banging his hands on the steering wheel and repeatedly slamming the car door open and shut. Dow BWC at 11:19:20-11:31:38. Plaintiff then suddenly jumped out of his car and started banging his fists on the hood of his roommate's car while screaming, and, ultimately, ran directly at Deputy Saunders. Saunders BWC at 11:30:00-11:35:17. Due to the wild and uncontrolled physicality of Plaintiff's actions, Deputies Saunders and Deputy Dow had reason to believe that he might be a threat to himself and others. Dow Dep. Tr. at 90:19-91:5, Saunders Rep. at 2-3; *see Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1096-97 (9th Cir. 2006) (plaintiff who was behaving erratically and ignoring police commands in parking lot objectively "posed a threat to himself, the police, and possibly to anyone who passed by him"). When Plaintiff then ran directly towards Deputy Saunders and refused to get on the ground despite repeated orders, the two officers also had ample reason to believe that he posed a threat to them. *Gregory v. Cnty. of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008) (objectively reasonable for three officers to pin plaintiff to ground and handcuff him for officer safety when plaintiff had committed no crime but behaved erratically and repeatedly ignored officer commands while approaching officers with a pen).

Moreover, although law enforcement officers are not "required to use the least intrusive degree of force possible," *Marquez v. City of Phoenix*, 693 F.3d 1167, 1174 (9th

Cir. 2012), the deputies did exactly that—likely in consideration of the mental health disturbance that Plaintiff was experiencing. Contrary to Plaintiff's assertions, the deputies did not immediately resort to force, or ignore "clear, reasonable, and less intrusive alternatives." *Bryan*, 630 F.3d at 831. Instead, the video evidence shows that Deputies Dow and Saunders attempted to reason with and calm down Mr. Ross for nearly thirty minutes, even as Mr. Ross's behavior became increasingly erratic and unpredictable. *See* Dow BWC at 11:09:00-11:37:02. At the beginning of their interaction, when Plaintiff suddenly ran past both deputies and out of the apartment to lock himself in his car, they allowed him to exit the residence and slowly approached his vehicle and continued attempting to verbally calm him. *Id*. at 11:15:32-11:19:20. When Deputy Dow requested that he lower his car window so that she could hear what he was saying, Mr. Ross instead screamed and repeatedly slammed his hands on both his car door and steering wheel before suddenly running out of the car and past the deputies again. *Id*. at 11:19:20-11:31:38. Even so, neither deputy resorted to the use of force. When Mr. Ross began banging on Ms. Estrada's vehicle and suddenly ran towards Deputy Saunders—less than ten feet away from him—the deputies *still* did not resort to force. They instead issued *thirty-five* verbal commands to get on the ground, *seven more* verbal commands to turn around, and only after all these commands were ignored did Deputy Saunders deploy any physical force whatsoever.[9] *Id*.

Contrary to Plaintiff's argument that the deputies "utterly fail[ed] to consider" his mental disturbance in their response to him, Pl. Opp. Br. at 19, the Court finds that the deputies reasonably accounted for his mental illness by choosing to employ less intrusive alternatives to physical force for as long as possible, up till the moment they determined that his unpredictable and physically volatile behavior posed an immediate threat. While it is true that courts must consider mental illness in determining the reasonableness of law

---

[9] Plaintiff himself concedes that Deputy Saunders shouted these commands at Mr. Ross for several minutes before resorting to force. Pl. Opp. Br. at 17.

21CV-2130-JO-VET

enforcement's use of force, "[the fact] that an individual who poses an immediate threat may be mentally ill does not remove the case from the *Graham* analysis . . . . [a]ny mental health crisis experienced is considered in view of the surrounding circumstances." *Hart v. City of Redwood City*, 99 F.4th 543, 555 (9th Cir. 2024); *see also Sok Kong Tr. for Map Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020) ("mental illness or intoxication does not reduce the immediate and significant threat a suspect poses"). Here, the deputies were attentive and responsive to Plaintiff's mental health issues throughout the entire interaction. Deputy Dow testified that "right from the get-go," she suspected that Plaintiff was having a "mental health episode" or under the influence of a controlled substance due to his bizarre behavior. Dow Dep. Tr. at 68:14-70:15. She explained that she "tried to speak with at more of a lower, more understanding tone," "tried to reiterate multiple times we were there to help him and no was there [to hurt him]," and "tr[ied to] bring down the intensity of the interaction based on the concern that there was a potential mental health issue." *Id.* at 72:25-73:12. Only when his actions—likely caused or exacerbated by his mental breakdown—posed an immediate threat to the deputies and nearby civilians, did Deputy Saunders resort to any force. *Id.* at 77:18-79:1.

In sum, the deputies used a low to intermediate level of force to restrain the wild and erratic actions of a man having a mental health breakdown after attempting less intrusive alternatives for thirty minutes. Under these circumstances, no reasonable jury could find that the force that Deputy Saunders deployed was objectively unreasonable. *See Tatum*, 441 F.3d at 1090 (officers did not use excessive force in using an arm bar while forcing plaintiff suspected of drug use to ground); *see also Gregory*, 523 F.3d at 1108 (officers did not use excessive force in using a chokehold, handcuffs, and bodyweight to restrain plaintiff suspected of drug use). While the deputies did not believe that Plaintiff had committed a serious crime, the totality of the circumstances nevertheless justified Deputy Saunders' use of the low to intermediate level of force he employed. *See, e.g.*, *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 921 (9th Cir. 2001) (objectively reasonable to handcuff and twist arm of person who was not suspected of a serious crime

14

but resisted arrest).  The Court therefore finds that Deputy Saunders did not subject Plaintiff to excessive force when he brought him to the ground.  Because the undisputed facts establish that there was no constitutional violation, as required by the first prong of the qualified immunity analysis, the Court need not reach the second "clearly established law" prong to conclude that Deputy Saunders is entitled to qualified immunity for his actions up to this juncture.  *See Pearson*, 555 U.S. at 236-237.

## C.    Deputies Saunders and Dow's Actions While Holding Plaintiff on the Ground Were Not Objectively Unreasonable

The Court next turns to the second phase of the physical encounter, during which Deputies Saunders and Dow attempted to restrain and handcuff Plaintiff after he was brought to the ground by Deputy Saunders.

The Court begins this analysis by measuring "the quantum of force used" by Deputies Dow and Saunders as they were mounted on top of Plaintiff trying to immobilize him.  During this second phase of the physical confrontation, Deputy Dow attempted to restrain Plaintiff's legs by holding them and rolling her baton on his calves to induce pain (a common "pain compliance technique" used by law enforcement to subdue individuals), while Deputy Saunders deployed two closed fist strikes to Plaintiff's head, and one knee strike to his back.  Dow Rep. at 2-3; Dkt. 101, San Diego County Sheriff's Office – Use of Force Guidelines ("Force Guidelines") at 6; *see also* Dow Dep. Tr. at 80:22-25.  Both the Force Guidelines and Ninth Circuit caselaw categorize pain compliance techniques like those used by Deputy Dow as the lowest level of physical force.  Force Guidelines at 7 (categorizing pain compliance techniques including baton rolling as the lowest of the County's force categories); *see*, *e.g.*, *Brooks v. City of Seattle*, 599 F.3d 1018, 1027-28 (9th Cir. 2010), *on reh'g en banc sub nom Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) (*Mattos II*) (classifying pain compliance techniques as "less than intermediate" force); *Forrest v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994) (describing pain compliance techniques as "less significant than most claims of force").  Deputy Saunders, on the other hand, deployed more significant force in the form of two closed fist strikes to Mr. Ross's

15

head and one knee strike to his back. *See, e.g.*, *Garlick*, 167 F. Supp. at 1147 (E.D. Cal. 2016) ("[I]mpact blows by punching or kicking are considered 'significant force.'"); *Aranda v. City of McMinnville*, 942 F. Supp. 2d 1036, 1105 (D. Or. 2013) (finding that closed fist and knee strikes to an individual's head are a "significant" use of force); *Zawacky v. Clark Cnty.*, No. C22-5101-KKE, 2024 WL 2133956, at *4 (W.D. Wash. May 10, 2024) ("Impact blows, such as face punches . . . are generally considered significant intermediate force.") (quotation marks omitted).

By this point in the interaction, the Court finds that even Deputy Saunders' higher degree of force was objectively reasonable given that Mr. Ross's erratic behavior had escalated to active resistance to arrest, which significantly increased the immediate danger to the officers and nearby civilians. As the Ninth Circuit has repeatedly explained, "all resisting suspects pose some risk to officer safety," *Smith v. Agdeppa*, 81 F.4th 994, 1013 (9th Cir. 2023), and "even passive resistance supports the use of some degree of governmental force if necessary to attain compliance." *Bryan*, 630 F.3d at 830. However, the government's interest in using force is significantly greater when a person is actively resisting arrest, even when the person is mentally ill, because of the "greater threat to the officers" and the "risk of death or serious injury to the officers or [others] in the [vicinity]." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 949 (9th Cir. 2017) (deadly force used against mentally ill and actively resisting plaintiff was objectively reasonable given the increased "perceived threat to any reasonable officer" caused by his resistance); *see also Marquez*, 693 F.3d at 1175 (reasonable for officers to believe they were in immediate danger and to therefore use deadly force in light of plaintiff's active resistance, mental illness, and assaultive behavior).

Contrary to Plaintiff's assertions that "Mr. Ross did not resist arrest at any point" and "offered no more than passive resistance at most," Pl. Opp. Br. At 16, the video footage shows that Plaintiff fiercely and violently struggled with both Deputies Saunders and Dow on the ground for three full minutes before Deputy Ramos arrived. While all factual inferences are drawn in favor of the party opposing summary judgment, this is only "so

21CV-2130-JO-VET

long as their version of the facts is not blatantly contradicted by the video evidence." *Vos v. City of Newport Beach*, 892 F.3d 1024, 1028 (9th Cir. 2018) (internal citation omitted). Here, the video evidence shows that Mr. Ross was actively resisting arrest:  first, by attempting to turn and pull away from Deputy Saunders as he tried to handcuff him; second, by flexing his hands, kicking his legs, and resisting Deputies' Dow and Saunders' attempts to turn him once on the ground; third, by continuing to kick, flex, and thrash to frustrate all three deputies' attempts to handcuff him after Deputy Ramos arrived; and fourth, by continuing to resist the deputies' attempts to turn him over even after he had been handcuffed.  Saunders BWC at 11:36:45-11:41:02.  There can therefore be no reasonable dispute that Plaintiff was actively resisting arrest after he was brought to the ground.  *See, e.g.*, *Mattos II*, 661 F.3d at 445 (woman pulled over for speeding actively resisted arrest when she refused to get out of her car, stiffened her body, and clutched at her steering wheel); *Arpin*, 261 F.3d at 922 (suspect actively resisted being handcuffed by stiffening her arm and attempting to "pull free").

Under these circumstances—where Plaintiff, in a mentally unsound state, frightened his roommates and posed a threat to officers; refused to comply with repeated officer orders to surrender, turn around, or get on the ground; and then began actively and fiercely resisting arrest when officers attempted to use less forceful means of gaining compliance—no reasonable jury could conclude that the low to intermediate force used by Deputies Dow and Saunders was unconstitutionally excessive.  And as Defendants correctly argue, by this juncture, Plaintiff's active resistance to arrest constituted its own serious crime, a potential felony, further justifying the use of force under *Graham*.  490 U.S. at 396 (including severity of the crime as a factor in determining reasonableness of a use of force); D. Mot. Summ. J. at 15.  Because the Court finds that their uses of force were objectively reasonable based on the undisputed facts, the Court finds that Deputies Dow and Saunders are entitled to qualified immunity.

Even if a reasonable jury could find that the low to intermediate force used by Deputies Dow and Saunders was excessive, Plaintiff has not met his burden of identifying

21CV-2130-JO-VET

a case that provided them notice that their conduct was unlawful. To defeat qualified immunity, "a plaintiff must show that the officer's conduct was so egregious that any reasonable person would have recognized a constitutional violation," *Gasho v. United States*, 39 F.3d 1420, 1438 (9th Cir. 1994) (internal quotations omitted), by finding a case that is sufficiently similar that it "squarely governs the specific facts at issue." *Kisela*, 584 U.S. at 104 (internal quotations omitted). Plaintiff argues that *Scott*, 550 U.S. at 383, and *Deorle*, 272 F.3d at 1281, constitute clearly established law that put Deputy Saunders on notice that his uses of force were unconstitutional.

This argument fails for two reasons. First, the *Scott* court *approved* of the use of force at issue—ramming into the bumper of fleeing motorist and causing severe and permanent injury—as objectively reasonable. *Scott*, 550 U.S. 372, 381. Even if it bore some similarity to the facts of this case, it therefore could not have the effect of warning officers that such a use of force was excessive. Second, the *Deorle* case also fails to function as a clear prohibition on the actions in this case because it is too factually dissimilar. *Deorle* involved a much greater use of force and a plaintiff who offered no resistance. Like Mr. Ross, the plaintiff in *Deorle* was also suffering a mental breakdown, but, unlike Mr. Ross, he was "physically compliant and generally followed all the officers' instructions," including obeying the officers' instructions to drop his weapon. *Deorle*, 272 F.3d at 1277-78. Despite this lack of resistance or threat, the officer shot the plaintiff in the face with a lead bullet without any warning—a use of force that could be fatal—simply because he "walk[ed] directly at [the officer] at a steady gait" from more than twenty-five feet away. *Id.* at 1279. Those actions were held to be excessive because of the total lack of resistance from the plaintiff; by contrast, in this case, the officers confronted a noncompliant and fiercely resisting plaintiff who posed a significant potential danger to officers and nearby civilians. In addition, the Ninth Circuit found the lack of any warning to be a significant factor weighing against the reasonableness of that use of force; here, the deputies issued *42 warnings* to Plaintiff before using force. Neither of these cases,

therefore, constitute "clearly established law" that would notify reasonable officers that the actions in question violate the constitution. *Kisela*, 584 U.S. at 106.

Because no reasonable jury could conclude that Deputy Saunders' use of force against Mr. Ross was excessive, and because his use of force did not violate clearly established law, Deputies Dow and Saunders are entitled to qualified immunity with respect to their uses of force in the second phase of the interaction. *See Saucier v. Katz,* 533 U.S. 194, 201-2 (2001).

**D.    Deputy Ramos' Taser Deployments and Fist Strikes Were Not Unconstitutionally Excessive**

The Court next considers whether Deputy Ramos' use of force upon his arrival, including two Taser deployments and fist strikes, was excessive and unreasonable.[10] Pl. Opp. Br. at 20-22.

Based on its review of Ninth Circuit caselaw, the Court concludes that Deputy Ramos' two "dart-mode" Taser deployments and use of two closed-fist strikes against Plaintiff constituted "significant intermediate force." *See Bryan*, 630 F.3d at 826 (Tasers and stun guns fall into the category of intermediate or medium force); *see also Zawacky*, 2024 WL 2133956, at *4 (collecting Ninth Circuit cases and finding that "[i]mpact blows, such as face punches . . . are generally considered significant intermediate force."). This "significant, intermediate" amount of force must then be balanced against the Government's interest in using it using the *Graham* factors.

The Court finds that the significant, intermediate use of force was nevertheless objectively reasonable given the immediate danger that Plaintiff's continued forceful and active resistance to arrest posed to himself, the deputies, and nearby civilians. By the time

---

[10]    Plaintiff states in his opposition, without any evidentiary basis, that Deputy Ramos deployed his Taser three times instead of two. Pl. Opp. Br. at 20. The record evidence, as well as the corresponding section of the opposition briefing, reflect that Deputy Ramos deployed his Taser twice. The Court presumes that this was a typographical error and analyzes the two Taser deployments in the record; however, even assuming three Taser deployments instead of two, the Court's conclusion would remain the same.

Deputies Saunders and Dow called Deputy Ramos for backup, they had been unsuccessfully attempting to restrain Plaintiff for over three minutes. When Deputy Ramos arrived on the scene, he saw both deputies on the ground with Mr. Ross, struggling with great effort to hold him down. Ramos BWC at 11:38:30-11:39:15. Mr. Ross was not yet handcuffed and was within arm's reach of the deputies' weapons. *Id*. It was therefore objectively reasonable for Deputy Ramos to believe that Mr. Ross posed an immediate threat to the safety of Deputies Dow and Saunders. *See Smith v. City of Hemet*, 394 F.3d 689, 702 ("the most important of the *Graham* factors is the danger the suspect poses to the officer or others"). As previously explained, the danger to both the deputies and nearby civilians was significant throughout the entire encounter, but especially so after Plaintiff began actively resisting the officers' attempts to safely detain him. *See Isayeva*, 872 F.3d at 949 (greater force justified when a mentally ill person resists arrest due to the "greater threat to the officers" and the "risk of death or serious injury to the officers or [others] in the [vicinity].").

In addition, Deputy Ramos used only the force necessary to handcuff Plaintiff after attempting less intrusive alternatives, which supports the reasonableness of his actions. *Lowry v. City of San Diego*, 858 F.3d 1258, 1259 (use of less intrusive alternatives such as verbal commands prior to using force weighs in favor of reasonableness). When Deputy Ramos arrived, he did not immediately deploy his Taser; rather, he first attempted to assist Deputy Saunders in placing Mr. Ross's hands behind his back by grabbing his left arm. Ramos BWC at 11:38:30-11:39:15. Mr. Ross still continued to struggle and actively resist, even with three deputies now attempting to handcuff him. *Id*. at 11:38:30-11:41:00. It was only after several additional strikes from Deputy Saunders had failed, and Deputy Ramos had lost control of Mr. Ross's arm, that Deputy Ramos decided to deploy his Taser to prevent Mr. Ross from potentially grabbing one of the deputies' weapons. *Id.*; *see also* Ramos Dep. Tr. at 87, 186-7. Because Mr. Ross was not immobilized by the first Taser, Deputy Ramos deployed his Taser again several seconds later. Ramos Rep. at 6. He then delivered two closed-fist strikes to Mr. Ross's head, as Mr. Ross continued to struggle and

was still not handcuffed.[11]  *Id.*; *see also* Ramos BWC at 11:41:00-11:42:00.  Even so, it still took almost three more minutes and great effort from all three deputies to finally handcuff Mr. Ross, meaning *none* of the prior uses of force had been sufficient to successfully detain him.  Ramos BWC at 11:42:00-11:44:30.  The record reflects that the deputies escalated their uses of force only in direct correlation to Mr. Ross's continued resistance.

Given the undisputed facts on Mr. Ross's prolonged and active resistance; the danger he posed to himself, all three deputies, and his roommates; and the unsuccessful efforts of the deputies to use lesser amounts of force to detain Mr. Ross, the Court concludes that the officers' need to safely restrain Mr. Ross justified Deputy Ramos' significant level of force. *See Graham*, 490 U.S. at 396-97; *Hart*, 99 F.4th at 543 (objectively reasonable to use deadly force against mentally ill man who refused to comply with officers' commands and rapidly approached them); *A.B. v. Cnty. of San Diego*, No. 18CV1541-MMA-LL, 2020 WL 5847551, at *11 (S.D. Cal. Oct. 1, 2020) (objectively reasonable to use fist strikes and Taser in dart-mode against mentally ill man who refused to comply with officers' commands and resisted arrest), *aff'd*, No. 20-56140, 2022 WL 1055558 (9th Cir. Apr. 8, 2022).

Even if a reasonable jury could find that Deputy Ramos' Taser deployments constituted excessive force, Plaintiff has not met his burden of identifying a case that put Deputy Ramos on notice that his actions were unlawful.  Plaintiff points to *Bryan*, 630 F.3d at 805, and *Mattos II*, 661 F.3d at 433, as "clearly established law" that should have put Deputy Ramos on notice that his uses of force were excessive.  Pl. Opp. Br. at 20.  Because both cases are factually dissimilar, the Court disagrees.

---

[11]  Plaintiff asserts that Deputy Ramos lied about Mr. Ross attempting to bite him because the BWC footage does not clearly show this happening.  Because the BWC footage is inconclusive, for purposes of summary judgment, the Court infers that Mr. Ross did not attempt to bite Deputy Ramos and does not rely on this allegation in deciding the motion.

*Bryan* is fundamentally different from the situation at issue here because the *Bryan* plaintiff posed no threat and offered no physical resistance when officers tased him. *Bryan* involved a man who was also behaving erratically, wearing nothing but his underwear and shouting gibberish. 630 F.3d at 805, 826. But unlike Mr. Ross, despite his unbalanced state, it was undisputed that the *Bryan* plaintiff posed no threat: he never made any verbal or physical threat to the officer or anyone else; he was clearly and visibly unarmed given his nudity; and he was twenty-five feet away from the officer and facing *away* from him when he was tased. His only noncompliance was not remaining in his vehicle, a command that he testified he didn't hear from the officer. Given the significant differences in the potential danger to the officers, and Plaintiff's active resistance to arrest, *Bryan* cannot be said to have provided notice to any reasonable officer that tasing a forcefully resisting person was unconstitutionally excessive. *Scott v. Smith*, 109 F.4th 1215, 1222 (9th Cir. 2024).

*Mattos II* also poses facts too dissimilar to the instant case to have provided notice to Deputy Ramos that his actions could be unconstitutional. *Mattos II* involved two plaintiffs, a pregnant woman who had been pulled over for speeding, and a woman who had been involved in a domestic dispute with her husband and requested assistance from police. 661 F.3d at 433, 436-439. The first plaintiff's only noncompliance was refusing to get out of the vehicle after having informed the officers she was pregnant. The officers tased her three times in less than one minute, even as she offered no physical resistance whatsoever. *Id*. The second plaintiff in *Mattos II* had asked her daughter to call 911 during a domestic dispute with her husband. *Id*. at 437-8. Her only act of noncompliance was not immediately moving out of the way of an officer who had stepped towards her husband to arrest him. While she attempted to defuse the situation verbally, the officer tased her without warning. *Id*. at 437. The Ninth Circuit held this to be unreasonable because Mattos' resistance was "minimal," she was otherwise cooperating with the officers, and "posed no threat to [them]." *Id*. at 449-451. Here, by contrast, Mr. Ross resisted fiercely and posed a threat to himself, the officers, and nearby civilians. Neither scenario discussed

22

in *Mattos II* can be said to provide clear notice to "any reasonable officer" that it would be unconstitutional to tase an actively resisting suspect. *Graham*, 490 U.S. at 396.

Therefore, after reviewing the cases invoked by Plaintiff, the Court concludes that Plaintiff has failed to carry his burden of identifying a case that would have put Deputy Ramos on notice that his actions were unconstitutional. This Court's conclusion that the force here does not violate clearly established law is further supported by *Spencer v. Pew*, 117 F.4th 1130 (9th Cir. 2024). Unlike *Mattos II*, and more like this case, *Spencer* involved a plaintiff who resisted arrest by pushing one of the deputies with his shoulder and refusing to place his hands behind his back. The deputies punched Spencer in the face, knocked him to the ground, and tased him at least four times in rapid succession, while they also repeatedly punched and kicked him on the ground. *Id.* at 1134. Nevertheless, the Ninth Circuit held that qualified immunity shielded the deputies' actions, because the Taser cases identified by the *Spencer* plaintiff, including *Mattos II*, were "materially distinguishable" given the differences in the levels of resistance. *Id.* at 1141.

In sum, even if a reasonable jury could find that Deputy Ramos' Taser deployments and fist strikes constituted excessive force in this instance, because there was no clearly established precedent governing the unconstitutionality of Tasers and fist strikes in the situation that Deputy Ramos faced, *see id.*, 117 F.4th 1130, Deputy Ramos is also entitled to qualified immunity with respect to these uses of force.

**E.    The Deputies' Use of Handcuffs and WRAP Restraints Was Not Unconstitutional**

Finally, the Court considers whether Deputies McCarthy, Dow, and Saunders' use of handcuffs and a WRAP device for full-body immobilization constituted excessive force. SAC at 9.

The Court concludes that the use of handcuffs and full-body restraints constituted a significant but lesser use of force than the impact strikes and Taser deployments. The Force Guidelines place full-body restraints, including WRAP devices, on the same level as Deputy Dow's pain compliance technique, the lowest amount of physical force. Force

Guidelines at 8.  Multiple courts in this Circuit have likewise found that WRAP devices and full-body restraints are lower than intermediate levels of force, given the purpose of the device, the objectively lesser level of force compared to impact blows and other intermediate uses of force, and the lower likelihood of injury.  *See, e.g.*, *A.B.*, 2020 WL 5847551 at (WRAP device was a "substantial" but less than intermediate use of force); *accord Brown v. Basznianyn*, No. CV 21-00050-TUC-DCB, 2023 WL 3098982, at *13 (D. Ariz. Mar. 29, 2023) (restraint chair was "non-trivial" but less than intermediate force).  The Court will therefore balance this less than intermediate force against the government's interest in safely detaining Mr. Ross.

The Court finds that this lower level of force was objectively reasonable, given Plaintiff's continued resistance to arrest even at this late stage, and the threat he posed to the deputies and nearby civilians were he to break free from their restraint.  Given that it took a total of four deputies, ten minutes, two tases, and multiple impact strikes to Plaintiff's head and back to restrain him, it is difficult to see how Plaintiff could have been detained without the use of handcuffs.  Even *after* Mr. Ross was handcuffed, he still visibly struggled against the efforts of three deputies to keep him still.  Saunders BWC at 11:43:30-11:46:38, Ramos BWC at 11:43:30-11:46:38.  Because of this resistance, he continued to present a potential danger to himself and the deputies.  *See Isayeva*, 872 F.3d at 949.  It was therefore objectively reasonable for the deputies to use additional restraints for their own safety and to prevent plaintiff from harming himself or others.  *See Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 593 (7th Cir. 1997) (citing *Mayard v. Hopwood*, 105 F.3d 1226, 1227–28 (8th Cir. 1997)) ("restraining a person in a prone position is not, in and of itself, excessive force when the person restrained is resisting arrest"); *accord Tatum*, 441 F.3d at 1098.

In addition, even if a reasonable jury could find that these actions constituted excessive force, Plaintiffs have not identified a single case that could have put the deputies on notice that using a WRAP device to restrain an actively resisting individual would be unlawful.  As such, the deputies are all entitled to qualified immunity with respect to this

final use of force.  The Court therefore grants the deputies' motion for summary judgment as to Plaintiff's first claim of excessive force.

## F.    Because the Deputies Did Not Commit a Constitutional Violation, The County and Sheriff's Department Cannot Be Held Liable

The Court next considers Plaintiff's argument that the County of San Diego and the San Diego Sheriff's Department are liable for the excessive force used by its employees. SAC ¶¶ 82-84, 99, 103.

Municipalities such as the County of San Diego can be held liable for the constitutional violations of their officers where their poor training or policies caused such violations.  *Monell*, 436 U.S. at 694 (1978); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989); *see also Davis v. City of Ellensburg,* 869 F.2d 1320, 1325 (9th Cir. 2011).  It is well-established that municipalities can only be held liable for such *Monell* claims when there is in fact an underlying constitutional violation committed by its employee(s). *See Long v. City and Cnty. of Honolulu*, 511 F.3d 901, 907 (2007) (where there was no constitutional violation of plaintiff's rights by the defendant officers, there was "no basis for finding the officers inadequately trained" to establish liability under *Monell*); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) (same).  Here, as discussed above, the deputies' actions were objectively reasonable and therefore did not constitute a violation of Mr. Ross's constitutional rights.  In the absence of an underlying constitutional violation, the County of San Diego and San Diego Sheriff's Department cannot be held liable and are entitled to summary judgment on Plaintiff's third and fourth claims against them.

## G.    Plaintiff's Fourteenth Amendment Due Process Claim Fails As a Matter of Law

The Court next examines Defendants' argument that Plaintiff's Fourteenth Amendment claim, while styled as a due process arbitrary arrest claim, is essentially tantamount to an excessive force claim.  Because the appropriate vehicle for challenging excessive force is the Fourth Amendment, any excessive force claims brought under the Fourteenth Amendment would fail as a matter of law.  Def. Mot. Summ. J. at 21-22; *Graham*, 490 U.S. at 395 (holding that courts should analyze excessive force under the

Fourth Amendment's reasonableness standard, rather than under the Fourteenth Amendment's Due Process Clause).  Upon reviewing Plaintiff's operative complaint, the Court agrees with Defendants.  While Plaintiff nominally brings this claim under the Due Process Clause of the Fourteenth Amendment, the factual allegations in the complaint and opposition briefing all relate to excessive force, rather than an arbitrary investigation and arrest.  *See* SAC ¶¶ 68-79.  Plaintiff appears to concede that his Fourteenth Amendment claim is in essence an excessive force claim; he does not address these arguments in his opposition briefing whatsoever.  Because the Fourteenth Amendment is not the appropriate vehicle to challenge excessive force, the Court grants summary judgment and dismisses Plaintiff's second cause of action.

**H.    The Court Declines Jurisdiction Over Plaintiff's Remaining State Law Claim**

Because the Court has dismissed Plaintiff's federal claims, it declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims of battery, negligence, and violations of the Bane Act.  A court may exercise supplemental jurisdiction to hear a litigants' state law claims that "derive from a common nucleus of operative fact[s]" as their federal claims.  28 U.S.C. § 1367(c); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1174 (9th Cir. 2002).  But where it has dismissed all federal claims over which it had original jurisdiction, it may decline to extend its jurisdiction to the remaining state claims.  *See id.*; *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 561 (9th Cir. 2010).  In deciding whether to continue to exercise supplemental jurisdiction, the Court considers the interests of judicial economy, convenience, fairness, and comity.  *City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 173 (1997); *Smith v. Lenches*, 263 F.3d 972, 977 (9th Cir. 2001).  Here, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  Because the Court has dismissed all of Plaintiff's federal claims—the claims that conferred original jurisdiction—the Court need not exercise supplemental jurisdiction over the remaining state law claims.  *See* 28 U.S.C. § 1367(c); *Sanford*, 625 F.3d at 561 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent

jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7 (1988)). Thus, Plaintiff's state law claims are dismissed without prejudice to refiling in state court.

## IV. CONCLUSION

For the reasons described above, the Court grants Defendants' motion for summary judgment and DISMISSES Plaintiff's federal claims with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims and DISMISSES those claims without prejudice. The Court directs the Clerk of the Court to close the case.

**IT IS SO ORDERED**.

Dated:  March 27, 2025

_____
Honorable Jinsook Ohta
United States District Judge

21CV-2130-JO-VET